## DODSON v. THOMPSON, Superintendent of Insurance of Missouri, et al.

### No. 9249.

Circuit Court of Appeals, Eighth Circuit.

April 13, 1932.

George C. Mackay, of St. Louis, Mo. (Royal L. Coburn, of St. Louis, Mo., and Herbert A. Huff, Thomas D. Huff, and Chauncey M. Millar, all of Chicago, Ill., on the brief), for appellant.

William L. Mason, of St. Louis, Mo. (James A. Potter, of Jefferson City, Harry S. Rooks, of St. Louis, Mo., Otto & Potter, of Jefferson City, Mo., and Foristel, Mudd, Blair & Habenicht and Mason, Goodman & Flynn, all of St. Louis, Mo., on the brief), for appellees.

Before STONE, and KENYON, Circuit Judges, and CANT, District Judge.

STONE, Circuit Judge.

This is an action brought by the receivers of the International Company of St. Louis against William E. Dodson and R. C. Toombs to secure the cancellation of a certificate for 70,000 shares of the preferred stock of that company. This certificate was issued to Toombs and by him pledged with Dodson to secure the payment of a note for $100,000. The basis of the action is that the certificate

was fraudulently issued without any consideration therefor, and that Dodson, at the time he received the stock as collateral pledge, had knowledge of facts which should have put him on inquiry, and that such inquiry would have developed the above character of issue. Toombs made no defense, and the action is really between the receivers and Dodson. The trial court made extended findings of fact and stated conclusions of law upon which it entered a decree that the certificate was fraudulently issued and void, was to be surrendered for cancellation, and the defendant Dodson perpetually enjoined from transferring or delivering it except for cancellation. From such decree this appeal is brought.

The International Company of St. Louis is a corporation organized for holding, buying, and selling stocks and other securities and as a trade and finance corporation. It is quite evident that the main purpose of its organization was to act as a holding company for a decided majority of the stock of the International Insurance Company, and at all times here involved it was the holder of 23,624 shares out of a total issue of 37,500 shares of the insurance company. The international company had 2,000 shares of common stock of the par value of $1 a share, all issued and outstanding, which was closely held. It had an authorized issue of 4,998,000 shares of preferred nonvoting stock of the par value of $1 a share.

Appellant Dodson was engaged in Chicago in the business of timber investments and general brokerage. In the latter part of 1926, or early in 1927, B. O. McReynolds and J. B. McCutcheon informed Dodson that they desired to borrow $3,650,000 in the name of McReynolds for the purpose of purchasing the 2,000 shares of common stock of the International Company. Dodson undertook to procure this loan for a commission. Toombs and Daily operated an investment mortgage loan business on a considerable scale in Chicago, and Dodson was acquainted with the prominent members in that corporation. An incidental meeting with Daily led to the submission of the proposition to Toombs and Daily with the result that they took up seriously the procurement of the loan. After extended effort by Toombs, the amount was procured for the loan upon certain conditions. McReynolds and McCutcheon were not able to meet these conditions as one of them involved an illegal use of the funds of the insurance company in connection with the loan. The result was that this deal entirely

failed. Shortly thereafter and without any suggestion from Dodson, Toombs bought for Toombs and Daily this common stock of the International Company. Shortly thereafter, Toombs became chairman of the board of that company and president of the insurance company.

The contract of purchase was of June 22, 1927, although Toombs did not make final payment and secure control until September 30, 1927. Dodson had no connection with the negotiations between Toombs and the owners of the stock nor in procuring the loan to Toombs and Daily with which the stock was purchased by Toombs and was in no sense a factor or procuring cause of that sale. However, on October 17, 1927, Dodson writes Toombs and Daily as follows: "I understand from Mr. B. O. McReynolds, also from Mr. C. E. Clark, that the purchase of the International Insurance Company is fully consummated, and that you are now in full possession of the Company. Therefore the proper time has arrived to take up the question of commission due me both from you and Messrs. T. J. and B. O. McReynolds. I have as yet received nothing for my service in presenting this proposition to you, as you well know, and while I do not under the circumstances feel that I wish to crowd you, knowing that it has been some effort on your part to get together the necessary money to take over this Company, I would be pleased at your convenience, to call and discuss the matter and arrive at a conclusion of when and how I am to be paid." Receiving no answer, he again writes, on November 1, 1927, that he is anxious to have the matter adjusted "for the reason that it has been really consummated since the 22nd day of June, and you have had ample time to give my commission consideration." He does not ask for immediate payment, but that the matter be fully adjusted so that he will know when and how he will be paid. Still receiving no answer, upon November 29, 1927, he writes a further letter. On January 3, 1928, Toombs gives Dodson his personal note for $100,000, payable in two years. This note describes the certificate of stock involved here as collateral. The stock certificate is dated April 3, 1928.

The certificate in question was issued under the circumstances following. Some time between March 13 and 19, 1928, the assistant secretary of the International Company, Charles L. Brennaaun, was called into the office of Toombs, who was then president of the International Life Insurance Company. There was also present George E. Toombs,

a brother, who was then president of the International Company of St. Louis. Toombs explained that he and his brother George were going to Denver that night where they "had a deal on" for the sale of some International Company preferred stock, but at that time they did not know the names of the prospective purchasers nor the number of shares to be sold, but they wanted to be in position to complete the deal by turning over the certificates to the purchasers in exchange for the price. Under Toombs' instruction, he signed four blank certificates for preferred stock of the International Company and turned them over to George E. Toombs, the president of that company. The secretary was at that time informed that, when the deal was completed, George E. Toombs would sign the certificates as president, and that the proceeds of the sale would be turned over to the secretary for deposit and he would be furnished the names and addresses of the purchasers, the number of shares, and date of certificate, so that the certificate stubs could be properly filled in to complete the company's records. Later, George E. Toombs signed the four certificates as president, and they were filled in as issued to R. C. Toombs with various amounts of shares, the one here being for 70,000 shares. R. C. Toombs used each of these in a different personal transaction. No consideration whatsoever was ever given the company for the shares represented by any of these certificates.

There is no doubt of the fraudulent issue of this stock without any consideration to the corporation. The question is whether this stock, now in the hands of appellant, is subject to cancellation. Appellee contends it is, even though appellant be deemed an innocent purchaser for value, but, if this be not true, yet appellant was not such character of purchaser, being not innocent and having given no value therefor. As it is not necessary to our decision and without examination or determination of appellees' contention in that respect, we assume appellant can hold this stock if he be an innocent purchaser for value. Our inquiry is, therefore, whether he occupies such status. Our conclusion is that he does not.

At the time this stock was received by appellant, he knew that Toombs had completed his purpose of buying all of the common stock of the company; that his purpose in acquiring that stock was to gain control of the insurance company; that the preferred stock had no voting power and could have no part in Toombs' plan of purchase; that for nine months Toombs had had absolute

control over the company; that its officers were entirely of his choosing and subject to his control; that a large amount of money had been required to make this purchase of common stock; that the resources of Toombs had been strained to make this purchase; that the value of the preferred stock represented by this certificate was about $210,000; that Toombs had contemplated using the funds of the insurance company in purchasing mortgage notes from his own company (Toombs and Daily). Knowing these things, any prudent man would have wondered how Toombs had procured this certificate, and, knowing his complete control of the company officers, would have acted with caution in accepting it. The situation, plain to appellant, was that Toombs was in no financial condition to buy this preferred stock; that no purpose in buying it was apparent; that it represented a large investment value; that Toombs had complete control over the officers who would issue the stock. Such a situation is suspicious and would place any reasonably prudent man upon inquiry. This being true, appellant is charged with the knowledge which a reasonable inquiry would have developed. Obviously, such inquiry would have readily revealed the fraudulent issue.

The parties have argued several matters with ability. We do not examine them because the above is decisive and, we think, clear.

The decree is affirmed.